**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1360**

_____

RICHARD G. TATUM, individually and on behalf of a class of
all other persons similarly situated,

Plaintiff - Appellant,

v.

RJR PENSION INVESTMENT COMMITTEE; RJR EMPLOYEE BENEFITS
COMMITTEE; R.J. REYNOLDS TOBACCO HOLDINGS, INC.; R.J.
REYNOLDS TOBACCO COMPANY,

Defendants - Appellees.

------------------------------------------------------

AARP; NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; THOMAS E.
PEREZ, Secretary of the United States Department of Labor,

Amici Supporting Appellant,

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
AMERICAN BENEFITS COUNCIL,

Amici Supporting Appellees.

_____

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro. N. Carlton Tilley,
Jr., Senior District Judge. (1:02-cv-00373-NCT-LPA)

_____

Argued: March 18, 2014                    Decided: August 4, 2014

_____

Before WILKINSON, MOTZ, and DIAZ, Circuit Judges.

_____

Affirmed in part, vacated in part, reversed in part, and remanded by published opinion. Judge Motz wrote the majority opinion, in which Judge Diaz joined. Judge Wilkinson wrote a dissenting opinion.

———————————

**ARGUED**: Catha Worthman, LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C., Oakland, California, for Appellant. Adam Howard Charnes, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellees. Michael R. Hartman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Thomas E. Perez, Secretary of the United States Department of Labor. **ON BRIEF**: Jeffrey G. Lewis, LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C., Oakland, California; Robert M. Elliot, Helen L. Parsonage, ELLIOT MORGAN PARSONAGE, Winston-Salem, North Carolina; Kelly M. Dermody, Daniel M. Hutchinson, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California, for Appellant. Daniel R. Taylor, Jr., Richard D. Dietz, Chad D. Hansen, Thurston H. Webb, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellees. Ronald Dean, RONALD DEAN ALC, Pacific Palisades, California; Rebecca Hamburg Cappy, NATIONAL EMPLOYMENT LAWYERS ASSOCIATION, San Francisco, California; Mary Ellen Signorille, AARP FOUNDATION LITIGATION, Washington, D.C.; Melvin Radowitz, AARP, Washington, D.C., for Amici AARP and National Employment Lawyers Association. Hollis T. Hurd, THE BENEFITS DEPARTMENT, Bridgeville, Pennsylvania; Kathryn Comerford Todd, Steven P. Lehotsky, Jane E. Holman, NATIONAL CHAMBER LITIGATION CENTER, Washington, D.C.; Janet M. Jacobson, AMERICAN BENEFITS COUNCIL, Washington, D.C., for Amici Chamber of Commerce of the United States of America and American Benefits Council. M. Patricia Smith, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor for Plan Benefits Security, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, Stephanie Lewis, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Thomas E. Perez, Secretary of the United States Department of Labor.

———————————

2

DIANA GRIBBON MOTZ, Circuit Judge:

This is an appeal from a judgment in favor of R.J. Reynolds Tobacco Company and R.J. Reynolds Tobacco Holdings, Inc. (collectively "RJR"). Richard Tatum brought this suit on behalf of himself and other participants in RJR's 401(k) retirement savings plan (collectively "the participants"). He alleges that RJR breached its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., when it liquidated two funds held by the plan on an arbitrary timeline without conducting a thorough investigation, thereby causing a substantial loss to the plan.

After a bench trial, the district court found that RJR did indeed breach its fiduciary duty of procedural prudence and so bore the burden of proving that this breach did not cause loss to the plan participants. But the court concluded that RJR met this burden by establishing that "a reasonable and prudent fiduciary could have made [the same decision] after performing [a proper] investigation." Tatum v. R.J. Reynolds Tobacco Co., 926 F. Supp. 2d 648, 651 (M.D.N.C. 2013) (emphasis added). We affirm the court's holdings that RJR breached its duty of procedural prudence and therefore bore the burden of proof as to causation. But, because the court then failed to apply the correct legal standard in assessing RJR's liability, we must

3

reverse its judgment and remand the case for further proceedings consistent with this opinion.

I.

A.

In March 1999, fourteen years after the merger of Nabisco and R.J. Reynolds Tobacco into RJR Nabisco, Inc., the merged company decided to separate its food business, Nabisco, from its tobacco business, R.J. Reynolds. The company determined to do this through a spin-off of the tobacco business. The impetus behind the spin-off was the negative impact of tobacco litigation on Nabisco's stock price, a phenomenon known as the "tobacco taint." As the district court found, "[t]he purpose of the spin-off was to 'enhance shareholder value,' which included increasing the value of Nabisco by minimizing its exposure to and association with tobacco litigation." Id. at 658-59.

Prior to the spin-off, RJR Nabisco sponsored a 401(k) plan, which offered its participants the option to invest their contributions in any combination of eight investment funds. The plan offered six fully diversified funds -- some containing investment contracts, fixed-income securities, and bonds; some containing a broad range of domestic or international stocks; and some containing a mix of stocks and bonds. The plan also offered two company stock funds -- the Nabisco Common Stock

4

Fund, which held common stock of Nabisco Holdings Corporation, and the RJR Nabisco Common Stock Fund, which held stock in both the food and tobacco businesses. After the spin-off, the RJR Nabisco Common Stock Fund was divided into two separate funds: the Nabisco Group Holdings Common Stock Fund ("Nabisco Holdings"), which held the stock from the food business, and the RJR Common Stock Fund, which held the stock from the tobacco business.[1]

The 401(k) plan at issue in this case ("the Plan") was created on June 14, 1999, the date of the spin-off, by amendment to the existing RJR Nabisco plan. The Plan expressly provided for the retention of the Nabisco Funds as "frozen" funds in the Plan. Freezing the Nabisco Funds permitted participants to maintain their existing investments in the Nabisco Funds, but prevented participants from purchasing through the Plan additional shares of those funds. As the district court found, "[t]here was no language in the [Plan] eliminating the Nabisco Funds or limiting the duration in which the Plan would hold the funds." Id. at 657-58. The Plan also retained as investment

---

[1] Thus, as a result of the spin-off, there were two funds holding exclusively Nabisco stock: the Nabisco Common Stock Fund, which existed prior to the spin-off, and the Nabisco Group Holdings Common Stock Fund, which was created as a result of the spin-off. We refer to these two funds collectively as the "Nabisco Funds."

options the six diversified funds offered in the pre-spin-off plan, as well as the RJR Common Stock Fund.

The Plan named as Plan fiduciaries two committees composed of RJR officers and employees: the Employee Benefits Committee ("Benefits Committee"), responsible for general Plan administration, and the Pension Investment Committee ("Investment Committee"), responsible for Plan investments. The Plan vested the Benefits Committee with authority to make further amendments to the Plan by a majority vote of its members at any meeting or by an instrument in writing signed by a majority of its members.

Notwithstanding the requirement in the governing Plan document that the Nabisco Funds remain as frozen funds in the Plan, RJR determined to eliminate them from the Plan. RJR further determined to sell the Nabisco Funds approximately six months after the spin-off. These decisions were made at a March 1999 meeting by a "working group," which consisted of various corporate employees. Id. at 656-57. But, as the district court found, the working group "had no authority or responsibility under the then-existing Plan documents to implement any decision regarding the pre-spin[-off] RJR Nabisco Holdings Plan, nor [was it] later given authority to make or enforce decisions in the [RJR] Plan documents." Id. at 655.

6

According to testimony from members of the working group, the group spent only thirty to sixty minutes considering what to do with the Nabisco Funds in RJR's 401(k) plan. The working group "discussed reasons to remove the funds [from the plan] and assumed that [RJR] did not want Nabisco stocks in its 401(k) plan due to the high risk of having a single, non-employer stock fund in the Plan." Id. at 656. The members of the working group also discussed "their [incorrect] belief that such funds were only held in other [companies'] plans as frozen funds in times of transition." Id. Several members of the working group "believed that a single stock fund in the plan would be an 'added administrative complexity' and incur additional costs." Id. But the group "did not discuss specifically what the complexities were or the amount of costs of keeping the fund in the Plan, as balanced against any benefit to participants." Id. The working group agreed that the Nabisco Funds should be frozen at the time of the spin-off and eventually eliminated from the Plan. In terms of the timing of the divestment, a member of the working group testified that "[t]here was a general discussion, and different ideas were thrown out, would three months be appropriate, would a year be appropriate, and everybody got very comfortable with six months." Id. There was no testimony as to why six months was determined to be an appropriate timeframe.

7

The working group's recommendation was reported back to Robert Gordon, RJR's Executive Vice President for Human Resources and a member of both the Benefits Committee and the Investment Committee. Gordon testified at trial that the members of the Benefits Committee agreed with the working group's recommendation. But the district court found that aside from this testimony, there was no evidence that the Benefits Committee "met, discussed, or voted on the issue of eliminating the Nabisco Funds or otherwise signed a required consent in lieu of a meeting authorizing an amendment that would do so." Id. at 657.[2]

In the months immediately following the June 1999 spin-off, the Nabisco Funds declined precipitously in value. Markets reacted sharply to numerous class action tobacco lawsuits pending against RJR, which continued to impact the value of Nabisco stock as a result of the "tobacco taint." Id. at 659-60. Despite this decline in value, however, analyst reports throughout 1999 and 2000 rated Nabisco stock positively, "overwhelmingly recommending [to] 'hold' or 'buy,' particularly after the spin-off." Id. at 662.

---

[2] In November 1999, Gordon drafted a purported amendment to the Plan calling for the removal of Nabisco Funds from the Plan as of February 1, 2000. Because a majority of the Benefits Committee members neither voted on nor signed this amendment, the district court found it invalid. Id. at 674 n.19. No party challenges this ruling on appeal.

In early October 1999, various RJR human resources managers, corporate executives, and in-house legal staff met to discuss possible reconsideration of the decision made by the working group in March to sell the Nabisco Funds. Id. at 661. They decided against changing course, however, largely because they feared doing so would expose RJR to liability from employees who had already sold their shares of the Nabisco Funds in reliance on RJR's prior communications. Id. at 661-62.[3] The working group considered that this perceived liability risk could have been mitigated by temporarily unfreezing the Nabisco Funds and allowing Plan participants to reinvest if desired. But RJR was concerned that participants might view such action as a recommendation to hold or reinvest in Nabisco Funds and then blame RJR if the funds further declined. Id. at 661.

Moreover, RJR was concerned that keeping Nabisco Funds in the Plan would require the fiduciaries "to monitor and investigate them on a continuing basis and at significant expense paid from the Plan's trust." Id. at 662. Nevertheless, RJR decided against hiring "a financial consultant, outside

_____

[3] Apparently, no meeting attendee knew how many employees had already sold their shares of the Nabisco Funds. Following the meeting, RJR ascertained that the number of participants in each of the Nabisco Funds had decreased by approximately 15-16% as of September 30, 1999. Id. at 662. Thus, at the time the attendees considered whether to change course, the vast majority of employees still retained their shares in the Nabisco Funds.

counsel, and/or independent fiduciary to assist" it in resolving these questions and "deciding whether and when to eliminate the Nabisco Funds." Id. Assertedly, this was so because RJR believed that the Plan would have to pay the cost of such assistance. Id. But, as the district court found, "[t]he issue of monitoring the funds and how independent consultants were paid was not discussed at length or investigated." Id.

Later in October 1999, RJR sent a letter to Plan participants informing them that it would eliminate the Nabisco Funds from the Plan as of January 31, 2000. Id. at 663-64. The letter erroneously informed participants that the law did not permit the Plan to maintain the Nabisco Funds. Specifically, the letter stated: "Because regulations do not allow the Plan to offer ongoing investment in individual stocks other than Company stock, the 'frozen' [Nabisco] stock funds will be eliminated." Id. at 664 (alteration in original).

The human resources manager who drafted the letter testified at trial that she did so at the direction of Gordon, and that, at the time she prepared this letter, she knew the statement was incorrect. Id. No lawyer reviewed the letter before it was sent to participants. And, as the district court found, the statement "was never corrected, even after responsible RJR officials were informed that it was wrong." Id. Rather, a second letter, sent in January 2000, repeated the

10

incorrect statement. "By that time," the district court found, "RJR's managers, including its lawyers, had become aware that the statement was false, but nevertheless permitted the communication to be sent to participants." Id.

On January 27, 2000, days before the scheduled sale, plaintiff Richard Tatum sent an e-mail to both Gordon and Ann Johnston, Vice President for Human Resources and a member of the Benefits Committee and the Investment Committee. In this e-mail, Tatum asked that RJR not go through with the forced sale of the Plan's Nabisco shares because it would result in a 60% loss to his 401(k) account. Tatum indicated that he wanted to wait to sell his Nabisco stock until its price rebounded, and he noted that company communications had been "optimistic" that Nabisco stock would increase in value after the spin-off. He also related his understanding that former RJR employees of Winston-Salem Health Care and Winston-Salem Dental Care still retained frozen Nabisco and RJR funds in their 401(k) plans, even though those companies had been acquired by a different company, Novant, in 1996. (This claim was later substantiated through evidence at trial. See id. at 667 n.15.) In response to Tatum's concerns, Johnson replied that nothing could be done to stop the divestment. Id. at 667.

On January 31, 2000, RJR went through with the divestment and sold the Nabisco shares held by employees in their 401(k)

11

accounts. Between June 15, 1999 (the day after the spin-off) and January 31, 2000, the market price for Nabisco Holdings stock had dropped by 60% to $8.62 per share, and the price for Nabisco Common Stock had dropped by 28% to $30.18 per share. Id. at 665.

RJR invested the proceeds from the sale of the Nabisco stock in the Plan's "Interest Income Fund," which consisted of short-term investments, such as guaranteed investment contracts and government bonds. Id. The proceeds remained in the Interest Income Fund until a participant took action to reinvest them in one of the other six funds offered in the Plan. Id. At the same time as RJR eliminated Nabisco stocks from the employees' 401(k) Plan, several RJR corporate officers opted to retain their personal Nabisco stock or stock options. Id. at 665-66.

A few months after the divestment, in the early spring of 2000, Nabisco stock began to rise in value. On March 30, Carl Icahn made his fourth attempt at a takeover of Nabisco in the form of an unsolicited tender offer to purchase Nabisco Holdings for $13 per share. Id. at 666. The district court noted that "[b]efore his unsolicited offer, Icahn had made three previous attempts to take over Nabisco, between November 1996 and the spring of 1999, and was well known to have an interest in the company." Id. This tender offer provoked a bidding war, and,

12

on December 11, 2000, Philip Morris acquired Nabisco Common Stock at $55 per share and infused Nabisco Holdings with $11 billion in cash. RJR then purchased Nabisco Holdings for approximately $30 per share. As compared to the January 31, 2000 divestment prices, these share prices represented an increase of 247% for Nabisco Holdings stock and 82% for Nabisco Common Stock. Id.

B.

In May 2002, Tatum filed this class action against RJR as well as the Benefits Committee and the Investment Committee, asserting that they acted as Plan fiduciaries. Tatum alleged that these Plan fiduciaries breached their fiduciary duties under ERISA by eliminating Nabisco stock from the Plan on an arbitrary timeline without conducting a thorough investigation. He further claimed that their fiduciary breach caused substantial loss to the Plan because it forced the sale of the Plan's Nabisco Funds at their all-time low, despite the strong likelihood that Nabisco's stock prices would rebound.

In 2003, the district court granted RJR's motion to dismiss, concluding that Tatum's allegations involved "settlor" rather than "fiduciary" actions, meaning that the decision to eliminate the Nabisco Funds from the Plan was non-discretionary. We reversed, holding that the Plan documents did not mandate divestment of the Nabisco Funds, and thus did not preclude Tatum

13

from stating a claim against the defendants for breach of fiduciary duty. Tatum v. R.J. Reynolds Tobacco Co., 392 F.3d 636, 637 (4th Cir. 2004).

On remand, the district court granted RJR's motion to dismiss the Benefits Committee and the Investment Committee as defendants. After the limitations period had expired, Tatum filed a motion seeking leave to amend his complaint to add the individual committee members as defendants, which the court denied.[4] The court then held a bench trial from January 13 to February 9, 2010 to determine whether RJR breached its fiduciary duties in eliminating the Nabisco Funds from the Plan.

On February 25, 2013, the court issued its final judgment, containing detailed and extensive factual findings. The court recognized (as we had held) that RJR's decision to remove the Nabisco Funds from the Plan was a fiduciary act subject to the duty of prudence imposed by ERISA. Tatum, 926 F. Supp. 2d at 673. The court then held that (1) RJR breached its fiduciary duties when it "decided to remove and sell Nabisco stock from the Plan without undertaking a proper investigation into the prudence of doing so," id. at 651, and (2) as a breaching

---

[4] Shortly thereafter, the district court certified a class of Plan participants and beneficiaries whose investments in the Nabisco Funds were sold by RJR in connection with the spin-off. See Tatum v. R.J. Reynolds Tobacco Co., 254 F.R.D. 59, 62 (M.D.N.C. 2008). On appeal, RJR raises no challenge to this certification.

14

fiduciary, RJR bore the burden of proving that its breach did not cause the alleged losses to the Plan.  But the court further held that (3) RJR met its burden of proof because its decision to eliminate the Nabisco Funds was "one which a reasonable and prudent fiduciary could have made after performing such an investigation."  Id. (emphasis added).

Tatum noted a timely appeal.


II.

Congress enacted ERISA to protect "the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. § 1001(b).  Consistent with this purpose, ERISA imposes high standards of fiduciary duty on those responsible for the administration of employee benefit plans and the investment and disposal of plan assets.  As the Second Circuit has explained, "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are . . . the highest known to the law."  Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

15

Pursuant to the duty of loyalty, an ERISA fiduciary must "discharge his duties . . . solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). The duty of prudence requires ERISA fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B). The statute also requires fiduciaries to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." Id. § 1104(a)(1)(D). And fiduciaries have a duty to "diversify[] investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Id. § 1104(a)(1)(C). However, legislative history and federal regulations clarify that the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds.[5] Moreover, the diversification duty does not

---

[5] See H.R. Rep. No. 93-1280 (1974) (Conf. Rep.), reprinted at 1974 U.S.C.C.A.N. 5038, 5085-86 (clarifying that, in plans in which the participant exercises individual control over the assets in his individual account -- like the plan at issue here -- "if the participant instructs the plan trustee to invest the (Continued)

16

apply to investments that fall within the exemption for employer stocks provided for in § 1104(a)(2).

A fiduciary who breaches the duties imposed by ERISA is "personally liable" for "any losses to the plan resulting from [the] breach." Id. § 1109(a). Section 1109(a), ERISA's fiduciary liability provision, provides in full:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Id. ERISA thus provides for both monetary and equitable relief, and does not (as the dissent claims) limit a fiduciary's liability for breach of the duty of prudence to equitable relief.

In determining whether fiduciaries have breached their duty of prudence, we ask "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment

_____

full balance of his account in, e.g., a single stock, the trustee is not to be liable for any loss because of a failure to diversify or because the investment does not meet the prudent man standards" so long as the investment does not "contradict the terms of the plan"); see also 29 C.F.R. § 2550.404c–1(f)(5).

17

and to structure the investment." DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 420 (4th Cir. 2007). Our focus is on "whether the fiduciary engaged in a reasoned decision[-]making process, consistent with that of a 'prudent man acting in [a] like capacity.'" Id. (quoting 29 U.S.C. § 1104(a)(1)(B)).

When the fiduciary's conduct fails to meet this standard, and the plaintiff has made a prima facie case of loss, we next inquire whether the fiduciary's imprudent conduct caused the loss. For "[e]ven if a trustee failed to conduct an investigation before making a decision," and a loss occurred, the trustee "is insulated from liability . . . if a hypothetical prudent fiduciary would have made the same decision anyway." Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 218 (4th Cir. 2011) (quoting Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994)).

ERISA's fiduciary duties "draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." DiFelice, 497 F.3d at 417 (quoting Varity Corp. v. Howe, 516 U.S. 489, 496 (1996)). Thus, in interpreting ERISA, the common law of trusts informs a court's analysis. Id. "[T]rust law does not tell the entire story," however, because "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory

18

protection." Varity Corp., 516 U.S. at 497. Therefore, courts must be mindful that, in "develop[ing] a federal common law of rights and obligations under ERISA," Congress "expect[s] that" courts "will interpret th[e] prudent man rule (and the other fiduciary duties) bearing in mind the special nature and purpose of employee benefit plans." Id. (internal citations and quotation marks omitted).

On appeal, Tatum argues that, although the district court correctly determined that RJR breached its duty of procedural prudence and so bore the burden of proving that its breach did not cause the Plan's loss, the court applied the wrong standard for determining loss causation. He contends that the court incorrectly considered whether a reasonable fiduciary, after conducting a proper investigation, could have sold the Nabisco Funds at the same time and in the same manner, as opposed to whether a reasonable fiduciary would have done so.

In response, RJR contends that the district court applied the appropriate causation standard. In the alternative, RJR urges us to reverse the district court's holdings that it breached its duty of procedural prudence and that, as a breaching fiduciary, it bore the burden of proving that its breach did not cause the Plan's loss.

"We review a judgment resulting from a bench trial under a mixed standard of review -- factual findings may be reversed

19

only if clearly erroneous, while conclusions of law are examined de novo." Plasterers', 663 F.3d at 215 (internal quotation marks omitted).

III.

We first consider the district court's finding that RJR breached its duty of procedural prudence.[6]

A.

ERISA requires fiduciaries to employ "appropriate methods to investigate the merits of the investment and to structure the investment" as well as to "engage[] in a reasoned decision[-]making process, consistent with that of a 'prudent man acting in [a] like capacity.'" DiFelice, 497 F.3d at 420. The duty of

---

[6] We can quickly dispose of RJR's claim that it was not a fiduciary subject to ERISA's duty of prudence. RJR argues that the Plan fiduciaries, the Benefits Committee and the Investment Committee, exercised "exclusive fiduciary authority" over the management and administration of the Plan and that RJR qua employer is thus not liable as a Plan fiduciary. Appellee's Br. 49. ERISA, however, does not limit fiduciary status to the fiduciaries named in a plan document. Instead, ERISA provides that a person or entity is a "functional fiduciary" to the extent that he, she, or it "exercises any discretionary authority or discretionary control respecting management . . . or disposition of [the plan's] assets." 29 U.S.C. § 1002(21)(A) (emphasis added). Recognizing this standard, the district court held that RJR "made and implemented the elimination decision before any official committee action was ever attempted and failed to use the committees designated in the Plan . . . for any of the discretionary decisions." Tatum, 926 F. Supp. 2d at 672 n.18. Thus, we think it clear that RJR exercised actual control over the management and disposition of Plan assets, and so acted as a functional fiduciary.

20

prudence also requires fiduciaries to monitor the prudence of their investment decisions to ensure that they remain in the best interest of plan participants. Id. at 423.

"The evaluation is not a general one, but rather must 'depend on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time.'" Id. at 420 (alteration omitted) (quoting Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 299 (5th Cir. 2000)). Of course, a prudent fiduciary need not follow a uniform checklist. Courts have found that a variety of actions can support a finding that a fiduciary acted with procedural prudence, including, for example, appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight of the investment decision, and continuing to monitor and receive regular updates on the investment's performance. See, e.g., id. at 420-21; Bunch v. W.R. Grace & Co., 555 F.3d 1, 8-9 (1st Cir. 2009); Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc., 173 F.3d 313, 322 (5th Cir. 1999).[7] In other words, although the duty of procedural prudence requires more than "a pure heart and an

_____

[7] By contrast, courts have found that a fiduciary's failure to act in accordance with plan documents serves as evidence of imprudent conduct -- in addition to independently violating Subsection (D) of § 1104(a)(1) -- so long as the plan documents are consistent with ERISA's requirements. See, e.g., Dardaganis v. Grace Capital, Inc., 889 F.2d 1237, 1241 (2d Cir. 1989).

21

empty head," DiFelice, 497 F.3d at 418 (internal quotation marks and citation omitted), courts have readily determined that fiduciaries who act reasonably -- i.e., who appropriately investigate the merits of an investment decision prior to acting -- easily clear this bar.

B.

The district court carefully examined the relevant facts and made extensive factual findings to support its conclusion that RJR failed to engage in a prudent decision-making process.

The court found that "the working group's decision in March 1999 was made with virtually no discussion or analysis and was almost entirely based upon the assumptions of those present and not on research or investigation." Tatum, 926 F. Supp. 2d at 678. Indeed, the court found that the group's discussion of the Nabisco stocks lasted no longer than an hour and focused exclusively on removing the funds from the Plan.

The court further found "no evidence that the [working group] ever considered an alternative [to divestment within six months], such as maintaining the stock in a frozen fund indefinitely, making the timeline for divestment longer, or any other strategy to minimize a potential immediate loss to participants or any potential opportunity for gain." Id. at 680. Instead, the "driving consideration" was the "general risk of a single stock fund," as well as "the emphasis on the

22

unconfirmed assumption that RJR would no longer be exempt from the ERISA diversification requirement because the funds would no longer be employer stocks." Id. at 678. Yet the evidence adduced at trial showed that "no one researched the accuracy of that assumption, and it was later determined that nothing in the law or regulations required that the Nabisco Funds be removed from the Plan." Id. at 680.

The district court found that "the six month timeline for the divestment was chosen arbitrarily and with no research." Id. at 679. The working group failed to consider "[t]he idea that, perhaps, it would take a while for the tobacco taint to dissipate" or "the fact that determining for employees exactly when the stocks would be removed could result in large and unnecessary losses to the Plan through the individual accounts of employees." Id. Similarly, there was no consideration of "the purpose of the Plan, which was for long term retirement savings," or "the purpose of the spin-off, which was, in large part, to allow the Nabisco stock a chance to recover from the tobacco taint and hopefully rise in value." Id. at 678. The court found the failure to consider these issues particularly notable "[g]iven that the strategy behind the spin-off was largely to rid Nabisco stock prices of the 'tobacco taint.'" Id. at 680.

The court also found that the only time following the spin-off that RJR "actually discussed the merits of the [March] decision was at the October 8, 1999 meeting." Id. at 681. In that meeting, Gordon raised the concern from RJR's CEO that "participants were questioning the timing of the elimination given the Nabisco stocks' continued decline in value." Id. Although RJR engaged in this additional discussion, it undertook no investigation into the assumptions underlying its March decision to sell the Plan's Nabisco stock. Id. at 682.

Rather, those involved in the October discussion expressed "their view that the employees who cashed out their Nabisco stock at a loss were a problem," and there was "fear that [these] early sellers might sue RJR." Id. at 681 (internal quotation marks and alterations omitted). The court found that the discussion "focused around the liability of RJR, rather than what might be in the best interest of the participants." Id. at 682 (emphasis in original). As a result, RJR failed to explore the option of amending the Plan to temporarily unfreeze the Nabisco Funds and give "the early sellers the opportunity to repurchase the stock." Id. Nor did RJR consider any "other alternatives for remedying the problem." Id. The court noted that, despite fearing liability, RJR "still did not engage an independent analyst or outside counsel to analyze the problem." Id. at 681-82.

24

The court found no evidence of any other discussions in which RJR ever "contemplated any formal action other than what had already been decided at the March meeting." Id. at 680. Instead, the evidence showed that RJR's focus after the spin-off "was on setting a specific date for divestment and on providing notice to participants regarding the planned removal of the funds." Id. at 680-81. "Indicative of the pervading mindset against reexamining the original decision were the communications known to be false when sent to participants" by RJR with the October 1999 and January 2000 401(k) statements. Id. at 681.

In sum, the district court found that "there [wa]s no evidence -- in the form of documentation or testimony -- of any process by which fiduciaries investigated, analyzed, or considered the circumstances regarding the Nabisco stocks and whether it was appropriate to divest." Id. at 679. The court explained that, in light of the fiduciary duty to act "solely in the interest of participants and beneficiaries," it was clearly improper for the fiduciaries "to consider their own potential liability as part of the reason for not changing course on their decision to divest the Plan of Nabisco stocks." Id. at 681 (emphasis in original). The district court concluded that "[t]he lack of effort on the part of those considering the removal of the Nabisco Funds -- from March 1999 until the stock

was removed from the plan on January 31, 2000 -- compel[led] a finding that the RJR decision-makers in this case failed to exercise prudence in coming to their decision to eliminate the Nabisco Funds from the Plan." Id. at 682.

C.

Despite these extensive factual findings, RJR contends that it did not breach its duty of procedural prudence and that the district court too rigorously scrutinized its procedural process in so holding. We cannot agree.

As a threshold matter, RJR provides no basis for this court to question the district court's well-supported factual finding that RJR failed to present evidence of "any process by which fiduciaries investigated, analyzed, or considered the circumstances regarding the Nabisco stocks and whether it was appropriate to divest." Id. at 679 (emphasis added). By conducting no investigation, analysis, or review of the circumstances surrounding the divestment, RJR acted with procedural imprudence no matter what level of scrutiny is applied to its actions.

Instead of grappling with its failure to conduct any investigation, RJR urges us to hold that it did not breach its duty of procedural prudence because certain types of investment decisions assertedly trigger a lesser standard of procedural prudence. Thus, RJR contends that "[n]on-employer, single stock

26

funds are imprudent _per se_" due to their inherent risk. Appellee's Br. 35.[8] But this _per se_ approach is directly at odds with our case law and federal regulations interpreting ERISA's duty of prudence. See _DiFelice_, 497 F.3d at 420 (explaining that, in all cases, evaluating the prudence of an investment decision requires a totality-of-the-circumstances inquiry that takes into account "the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time" (internal quotation marks omitted)); 29 C.F.R. § 2550.404a-1(b)(1) (stressing the importance of a totality-of-the-circumstances inquiry). Indeed, in promulgating its regulations, the Department of Labor expressly rejected the suggestion that a particular investment can be deemed _per se_ prudent or _per se_ imprudent based on its level of risk. See Investment of Plan Assets under the "Prudence" Rule, 44 Fed. Reg. 37,221, 37,225 (June 26, 1979); see also _id._ at 37,224-25 (declining to create "any list of investments, classes of investment, or investment techniques" deemed permissible or impermissible under the prudence rule).

Nor is there any merit to RJR's contention that its decision to sell the employees' Nabisco shares merits less

---

[8] We note that at the time plan participants purchased shares of the Nabisco Funds through the Plan, they were indeed employer funds.

scrutiny because that decision was assertedly made "in the face of financial trouble" to "protect[] participants and advance[] a fiduciary's duty to 'minimize the risk of large losses.'" Appellee's Br. 34 (citation omitted). To adopt this argument, we would have to ignore the findings of the district court as to the actual context in which RJR acted.

The court found that, without undertaking any investigation, RJR forced the sale, within an arbitrary timeframe, of funds in which Plan participants had already invested. The court found that RJR adhered to that decision in the face of sharply declining share prices and despite contemporaneous analyst reports projecting the future growth of those share prices and "overwhelmingly" recommending that investors "buy" or at least "hold" Nabisco stocks. The court also found that RJR did so without consulting any experts, without considering that the Plan's purpose was to provide for retirement savings, and without acknowledging that the spin-off was undertaken in large part to enhance the future value of the Nabisco stock by eliminating the tobacco taint.

The district court further found that RJR sold the Nabisco funds when it did because of its fear of liability, not out of concern for its employees' best interests. RJR blinks at reality in maintaining that its actions served to "protect[] participants" or to "minimize the risk of large losses." To the

28

contrary, RJR's decision to force the sale of its employees' shares of Nabisco stock, within an arbitrary timeframe and irrespective of the prevailing circumstances, ensured immediate and permanent losses to the Plan and its beneficiaries.

In sum, in support of its holding that RJR breached its duty of procedural prudence, the district court made extensive and careful factual findings, all of which were well supported by the record evidence. RJR's challenge to those findings fails.

IV.

We next address the district court's holding with respect to which party bears the burden of proof as to loss causation. A breach of fiduciary duty "does not automatically equate to causation of loss and therefore liability." Plasterers', 663 F.3d at 217. ERISA provides that a fiduciary who breaches its duties "shall be personally liable" for "any losses to the plan resulting from each such breach." Id. (quoting 29 U.S.C. § 1109(a)). Accordingly, in Plasterers', we adopted the Seventh Circuit's reasoning that "[i]f trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund." Id. (emphasis added) (quoting Brock v. Robbins, 830 F.2d 640, 647 (7th Cir. 1987)). We cautioned, however, that

29

"imprudent conduct will usually result in a loss to the fund, a loss for which [the fiduciary] will be monetarily penalized." Id. at 218 (quoting Brock, 830 F.3d at 647). But in Plasterers' we did not need to answer the question of which party bore the burden of proof on loss causation.

In this case, the district court had to resolve that question. The court held that the burden of both production and persuasion rested on RJR at this stage of the proceedings. The court explained that "once Tatum made a showing that there was a breach of fiduciary duty and some sort of loss to the plan, RJR assumed the burden (that is, the burden of production and persuasion) to show that the decision to remove the Nabisco stock from the plan was objectively prudent." Tatum, 926 F. Supp. 2d at 683.[9] RJR contends that in doing so, the court erred. We disagree.

Generally, of course, when a statute is silent, the default rule provides that the burden of proof rests with the plaintiff. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56 (2005). But "[t]he ordinary default rule . . . admits of exceptions," id. at 57, and one such exception arises under the common law of

---

[9] Thus, contrary to RJR's passing comment on appeal, see Appellee's Br. 22 n.4, the district court did find that Tatum made a prima facie showing of loss. Moreover, no party disputes that, on January 31, 2000, when RJR sold all of the Plan's Nabisco stock, that stock's value was at an all-time low.

trusts. "[I]n matters of causation, when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100, cmt. f (2012) (internal citation omitted); see also Bogert & Bogert, The Law of Trusts and Trustees § 871 (2d rev. ed. 1995 & Supp. 2013) ("If the beneficiary makes a prima facie case, the burden of contradicting it . . . will shift to the trustee.").

The district court adopted this well-established approach. It reasoned that requiring the defendant-fiduciary, here RJR, to bear the burden of proof was the "most fair" approach "considering that a causation analysis would only follow a finding of [fiduciary] breach." Tatum, 926 F. Supp. 2d at 684; see also Roth, 16 F.3d at 917 (stating that once the ERISA plaintiff meets this burden, "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty." (alteration in original) (internal quotation marks omitted)); McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995); cf. Sec'y of U.S. Dep't of Labor v. Gilley, 290 F.3d 827, 830 (6th Cir. 2002) (placing the burden of proof on the defendant-fiduciary to disprove damages); N.Y.

31

State Teamsters Council v. Estate of DePerno, 18 F.3d 179, 182-83 (2d Cir. 1994) (same).[10]

We have previously recognized the burden-shifting framework in an analogous context. In Brink v. DaLesio, 667 F.2d 420 (4th Cir. 1982), modified and superseded on denial of reh'g, (1982), we considered the impact of a breach of fiduciary duty under the

---

[10] None of the cases RJR and the dissent cite to support their contrary view persuade us that the district court erred. See Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 105 (2d Cir. 1998); Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995), abrogated by Fifth Third Bancorp v. Dudenhoeffer, No. 12-751, 573 U.S. -- (2014); Willett v. Blue Cross & Blue Shield of Ala., 953 F.2d 1335, 1343 (11th Cir. 1992). Neither Kuper nor Willett addressed a situation in which plaintiffs had already established both fiduciary breach and a loss. Moreover, in Silverman, the decision not to shift the burden of proof was based in large part on the unique nature of a co-fiduciary's liability under § 1105(a)(3). See 138 F.3d at 106 (Jacobs, J., concurring). That reasoning does not apply to the present case, in which plan participants sued under § 1104(a)(1) and alleged losses directly linked to the defendant-fiduciary's own fiduciary breach. Nor does it appear that the Second Circuit would apply the Silverman reasoning to a case brought under § 1104(a). See N.Y. State Teamsters Council, 18 F.3d at 182, 182-83 (acknowledging "the general rule that a plaintiff bears the burden of proving the fact of damages" but concluding in an ERISA case that "once the beneficiaries have established their prima facie case by demonstrating the trustees' breach of fiduciary duty, the burden of explanation or justification shifts to the fiduciaries" (internal quotation marks and alterations omitted)). Furthermore, Willett, which the dissent quotes at length, actually undercuts its position. There the court held that the burden of proof remained with the plaintiff, prior to establishing breach, but that "in order to prevail as a matter of law," it was the defendant-fiduciary who had to "establish the absence of causation by proving that the beneficiaries' claimed losses could not have resulted from [defendant-fiduciary's] failure to cure [the co-fiduciary's] breach." 953 F.2d at 1343 (emphasis added).

32

Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501. We explained that "[i]t is generally recognized that one who acts in violation of his fiduciary duty bears the burden of showing that he acted fairly and reasonably." Id. at 426. Thus, we held that the district court in that case had erred when, after finding that the defendant breached his fiduciary duty, it placed the burden on the plaintiffs to prove what, if any, damages were attributable to that breach. Id.[11]

Moreover, this burden-shifting framework comports with the structure and purpose of ERISA. As stated in its preamble, the statute's primary objective is to protect "the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). To achieve this purpose, ERISA imposes fiduciary obligations on those responsible for administering

---

[11] RJR and the dissent suggest that our holding in U.S. Life Insurance Co. v. Mechanics & Farmers Bank, 685 F.2d 887 (4th Cir. 1982), supports their view that RJR did not bear the burden of proof. They contend that in U.S. Life, we held that "placing the burden of proof on a plaintiff [here Tatum] to prove causation is supported by trust law." Appellee's Br. 21. But, in fact, in U.S. Life, we dealt with the unique situation in which a trustee breached the terms of an indenture agreement and so assertedly violated state contract law. 685 F.2d at 889. Because the parties' relationship was principally contractual in nature (a critical fact that both RJR and the dissent ignore), we declined to apply a burden-shifting framework in what we held was, in essence, a "typical breach of contract type of case." Id. at 896. Here, by contrast, ERISA -- not a contract -- governs the parties' relationship, and expressly imposes fiduciary -- not contractual -- duties. Thus, U.S. Life offers no support to RJR and the dissent.

33

employee benefit plans and plan assets, and provides for enforcement through "appropriate remedies, sanctions, and ready access to the Federal courts." Id. As amicus Secretary of Labor notes, "[i]mposing on plaintiffs who have established a fiduciary breach and a prima facie case of loss the burden of showing that the loss would not have occurred in the absence of a breach would create significant barriers for those (including the Secretary) who seek relief for fiduciary breaches." Amicus Br. of Sec'y of Labor 19-20. Such an approach would "provide an unfair advantage to a defendant who has already been shown to have engaged in wrongful conduct, minimizing the fiduciary provisions' deterrent effect." Id. at 20.

In sum, the long-recognized trust law principle -- that once a fiduciary is shown to have breached his fiduciary duty and a loss is established, he bears the burden of proof on loss causation -- applies here. Overwhelming evidence supported the district court's finding that RJR breached its fiduciary duty to act prudently and that this breach resulted in a prima facie showing of loss to the Plan. Thus, the court did not err in requiring RJR to prove that its imprudent decision-making did not cause the Plan's loss. Accordingly, we turn to the question of whether the district court correctly held that RJR carried its burden of proof on causation.

V.

To carry its burden, RJR had to prove that despite its imprudent decision-making process, its ultimate investment decision was "objectively prudent." Because the term "objective prudence" is not self-defining, in Plasterers', we turned to the standard set forth by our sister circuits. Thus, we explained that a decision is "objectively prudent" if "a hypothetical prudent fiduciary would have made the same decision anyway." 663 F.3d at 218 (quoting Roth, 16 F.3d at 919) (emphasis added); see also Peabody v. Davis, 636 F.3d 368, 375 (7th Cir. 2011); Bussian, 223 F.3d at 300; In re Unisys Sav. Plan Litig., 173 F.3d 145, 153-54 (3d Cir. 1999). Under this standard, a plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails unless the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision. Put another way, a plan fiduciary carries its burden by demonstrating that it would have reached the same decision had it undertaken a proper investigation.

Somewhat surprisingly, the dissent accuses us of concocting a new standard for loss causation, never adopted in Plasterers'. We cannot agree. We are simply applying the standard set forth by this court in Plasterers', a case on which the dissent itself heavily relies. The dissent's claim that Plasterers' decided

35

nothing more than that "causation of loss is not an axiomatic conclusion that flows from a breach" is baseless. For in Plasterers', immediately after recognizing that the district court had been "without the benefit of specific circuit guidance on this issue," 663 F.3d at 218 n.9, we stated what loss causation means. Thus, we then explained: "Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability [under § 1109(a)] if a hypothetical prudent fiduciary would have made the same decision anyway." Id. at 218 (quoting Roth, 16 F.3d at 919). This language would serve no purpose in the opinion if not to instruct the district court regarding the proper analysis on remand.[12]

---

[12] Moreover, the dissent is simply mistaken in contending that the standard applicable for loss causation "was not discussed, was not briefed, and was not before the court" in Plasterers'. In urging the court to adopt the loss causation requirement, the appellants' brief in Plasterers' cited the language from then-Judge Scalia's concurrence in Fink v. Nat'l Sav. & Trust Co., 772 F.2d 951, 962 (D.C. Cir. 1985), see infra at 40, and then recognized that:

> The Eighth Circuit's formulation of the rule [of loss causation in Roth] is more common, if less colorful: "Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." This rule follows directly from § 409 of ERISA, which provides that fiduciaries are liable only for "losses to the plan resulting from . . . a breach."

Br. of Appellants 21-22, Plasterers', 663 F.3d 210 (emphasis added) (citations omitted). Thus, both the loss causation requirement and the standard used to define it were indeed discussed, briefed, and before the court in Plasterers'.

36

The district court properly acknowledged the "would have" standard that we and our sister circuits have adopted. See Tatum, 926 F. Supp. 2d at 683. But the court nonetheless applied a different standard. Thus, it required RJR to prove only that "a hypothetical prudent fiduciary could have decided to eliminate the Nabisco Funds on January 31, 2000." Id. at 690 (emphasis added). The manner in which the district court evaluated the evidence unquestionably demonstrates that it indeed meant "could have" rather than "would have." See, e.g., id. at 689 n.29, 690. For instead of determining whether the evidence established that a prudent fiduciary, more likely than not, would have divested the Nabisco Funds at the time and in the manner in which RJR did, the court concluded that the evidence did not "compel a decision to maintain the Nabisco Funds in the Plan," and that a prudent investor "could [have] infer[red]" that it was prudent to sell. Id. at 686 (emphasis added).[13]

---

[13] For this analysis, the court relied on Kuper v. Quantum Chemicals Corp., 852 F. Supp. 1389, 1395 (S.D. Ohio 1994), aff'd sub nom. Kuper v. Iovenko, 66 F.3d at 1447. But Kuper is inapposite because it applied a presumption of reasonableness to a fiduciary's decision to retain company stock, a presumption that plaintiffs failed to rebut by establishing breach of fiduciary duty. See 66 F.3d at 1459. We have never applied this presumption, and the Supreme Court has recently clarified that ERISA contains no such presumption. See Dudenhoeffer, No. 12-751, 573 U.S.--, at 1. Moreover, this case differs from Kuper in two critical respects. First, Tatum challenges the (Continued)

RJR recognizes that the district court applied a "could have" standard, but argues that this is the proper standard for determining whether its divestment decision was objectively prudent. Alternatively, RJR maintains that, even if the district court erred in applying the "could have" rather than "would have" standard, the error was harmless. We address these arguments in turn.

A.

RJR acknowledges that the causation inquiry requires a finding of objective prudence. But it contends that a court measures a fiduciary's objective prudence by determining whether its "decision, when viewed objectively, is one a hypothetical prudent fiduciary could have made." Appellee's Br. 16 (emphasis added).

But we, like our sister circuits, have adopted the "would have" standard to determine a fiduciary's objective prudence. As the Supreme Court has explained, the distinction between "would" and "could" is both real and legally significant. See

divestment of stock, while Kuper involved a challenge to the retention of stock. Second, Tatum has established that RJR breached its fiduciary duty; Kuper never established this. Notably, the Sixth Circuit, which decided Kuper, has since expressly recognized, at least with respect to the amount of damages, that when a fiduciary breach is established, "uncertainty should be resolved against the breaching fiduciary." Gilley, 290 F.3d at 830 (emphasis added).

38

Knight v. Comm'r, 552 U.S. 181, 187-88, 192 (2008).  In opining that this distinction is simply "semantics at its worst," the dissent ignores Knight.  There, the Court instructed that "could" describes what is merely possible, while "would" describes what is probable.  Id. at 192.  "[D]etermining what would happen if a fact were changed . . . necessarily entails a prediction; and predictions are based on what would customarily or commonly occur."  Id. (emphasis added).  Inquiring what could have occurred, by contrast, spans a much broader range of decisions, encompassing even the most remote of possibilities.  See id. at 188 ("The fact that an individual could . . . do something is one reason he would . . ., but not the only possible reason.").

The "would have" standard is, of course, more difficult for a defendant-fiduciary to satisfy.  And that is the intended result.  "Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same."  In re Beck Indus., Inc., 605 F.2d 624, 636 (2d Cir. 1979).  ERISA's statutory scheme is premised on the recognition that "imprudent conduct will usually result in a loss to the fund, a loss for which [the fiduciary] will be monetarily penalized."  Plasterers', 663 F.3d at 218 (quoting Brock, 830 F.3d at 647).  We would diminish ERISA's enforcement provision to an empty shell if we permitted

39

a breaching fiduciary to escape liability by showing nothing more than the mere possibility that a prudent fiduciary "could have" made the same decision. As the Secretary of Labor notes, this approach would "create[] too low a bar, allowing breaching fiduciaries to avoid financial liability based on even remote possibilities." Amicus Br. of Sec'y of Labor 23.[14]

To support its contrary argument, RJR heavily relies on then-Judge Scalia's concurrence in Fink v. Nat'l Sav. & Trust Co., 772 F.2d 951 (D.C. Cir. 1985), in which he states:

> I know of no case in which a trustee who has happened -- through prayer, astrology or just blind luck -- to make (or hold) objectively prudent investments . . . has been held liable for losses from those investments because of his failure to investigate or evaluate beforehand.

Id. at 962 (Scalia, J., concurring in part and dissenting in part). But, despite the protestations of RJR and the dissent,

---

[14] Moreover, notwithstanding the suggestion of RJR and the dissent, the Supreme Court in Dudenhoeffer did not hold that the "could have" standard applies in determining whether a trustee, like RJR, who has utterly failed in its duty of procedural prudence, has nonetheless acted in an objectively prudent manner and so not caused loss to the plan. Rather, Dudenhoeffer addressed an allegation that a fiduciary failed to act on insider information. In this very different context, the Court held that when "faced with such claims," courts should "consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that [acting on insider information] would do more harm than good." Dudenhoeffer, No. 12-751, 573 U.S. --, at 20 (emphasis added). The Court's use of "could not have" in this limited context does not cast doubt on our instruction that a "would have" standard applies to determine loss causation after a fiduciary breach has been established.

40

this observation is entirely consistent with the "would have" standard we adopted in Plasterers'. It is simply another way of saying the same thing: that a fiduciary who fails to "investigate and evaluate beforehand" will not be found to have caused a loss if the fiduciary would have made the same decision if he had "investigat[ed] and evaluat[ed] beforehand." Id. Stated yet another way, the inquiry is whether the loss would have occurred regardless of the fiduciary's imprudence.

Of course, intuition suggests, and a review of the case law confirms, that while such "blind luck" is possible, it is rare. When a plaintiff has established a fiduciary breach and a loss, courts tend to conclude that the breaching fiduciary was liable. See Peabody, 636 F.3d at 375; Allison v. Bank One-Denver, 289 F.3d 1223, 1239 (10th Cir. 2002); Meyer v. Berkshire Life Ins. Co., 250 F. Supp. 2d 544, 571 (D. Md. 2003), aff'd, 372 F.3d 261, 267 (4th Cir. 2004); cf. Chao v. Hall Holding Co., 285 F.3d 415, 434, 437-39 (6th Cir. 2002); Donovan v. Cunningham, 716 F.2d 1455, 1476 (5th Cir. 1983). As explained above, that is precisely the result anticipated by ERISA's statutory scheme.

## B.

Alternatively, RJR maintains that, even if the district court erred in applying the "could have" rather than "would have" standard, the error was harmless. This is so, in RJR's view, because the facts found by the district court as to the

41

high-risk nature of the Nabisco Funds unquestionably establish that a prudent fiduciary would have eliminated them from the Plan. Appellee's Br. 20. This argument also fails.

Although risk is a relevant consideration in evaluating a divestment decision, risk cannot in and of itself establish that a fiduciary's decision was objectively prudent. Indeed, in promulgating the regulations governing ERISA fiduciary duties, the Department of Labor expressly rejected such an approach. In its Preamble to Rules and Regulations for Fiduciary Responsibility, the Department explained, as we noted above, that "the risk level of an investment does not alone make the investment per se prudent or per se imprudent." Investment of Plan Assets under the "Prudence" Rule, 44 Fed. Reg. 37,221, 37,225 (June 26, 1979). Moreover, the Department instructed that:

> an investment reasonably designed -- as part of a portfolio -- to further the purposes of the plan, and that is made upon appropriate consideration of the surrounding facts and circumstances, should not be deemed to be imprudent merely because the investment, standing alone, would have, for example, a relatively high degree of risk.

Id. at 37,224 (emphasis added); see also Dudenhoeffer, No. 12-751, 573 U.S. --, at 15 ("Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." (alteration in

42

original)); DiFelice, 497 F.3d at 420 (holding that, when determining whether an ERISA fiduciary has acted prudently, a court must consider the "character and aim of the particular plan and decision at issue and the circumstances prevailing at the time"). In sum, while the presence of risk is a relevant consideration in determining whether to divest a fund held by an ERISA plan, it is not controlling. We must therefore reject RJR's contention that it would necessarily be imprudent for a fiduciary to maintain an existing single-stock investment in a plan that, like the Plan at issue here, offers participants a diversified portfolio of investment options.

Moreover, we cannot hold that the district court's error in adopting the "could have" standard was harmless when the governing Plan document required the Nabisco Funds to remain as frozen funds in the Plan. ERISA mandates that fiduciaries act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." 29 U.S.C. § 1104(a)(1)(D).[15] Accordingly, courts

---

[15] On appeal, RJR suggests that following the Plan terms would have been inconsistent with ERISA. Specifically, RJR asserts that if it had maintained the Nabisco Funds as frozen funds after the spin-off, it would have violated ERISA's requirement that fiduciaries "diversify[] investments of the plan so as to minimize the risk of large losses." Id. § 1104(a)(1)(C). Thus, RJR argues that it "was required to divest the Nabisco Funds from the Plan." Appellee's Br. 27. Before the district court, however, RJR properly "admit[ted] (Continued)

have found a breaching fiduciary's failure to follow plan documents to be highly relevant in assessing loss causation. See Allison, 289 F.3d at 1239; Dardaganis, 889 F.2d at 1241.[16] Tatum stipulated at trial that he would not assert that RJR's failure to adhere to the Plan's terms rendered RJR automatically liable under § 1109(a). But he expressly preserved his argument that the Plan terms are "highly relevant" to the causation analysis and that "a prudent fiduciary would have taken [them] into account" in deciding whether to divest. Appellant's Br. 28 n.13; see also Mem. re: Legal Effect of Invalid Plan Amendment at 2, Tatum v. R.J. Reynolds Pension Inv. Comm. (2013)(No. 1:02-cv-00373-NCT-LPA), ECF No. 365. Therefore, the district court erred by failing to factor into its causation analysis RJR's lack of compliance with the governing Plan document.

For all of these reasons, after careful review of the record, we cannot hold that the district court's application of

---

that there are no regulations prohibiting single stock funds of any kind in an ERISA plan." Tatum, 926 F. Supp. 2d at 681. See supra note 5; see also H.R. Rep. No. 93-1280, reprinted at 1974 U.S.C.C.A.N. 5038, 5084-85 (explaining that whether a fiduciary's investment of plan assets violates the diversification duty depends on the "facts and circumstances of each case").

[16] Of course, this does not mean, as the dissent suggests, that plan terms trump the duty of prudence. It simply means that plan terms, and the fiduciary's lack of compliance with those terms, inform a court's inquiry as to how a prudent fiduciary would act under the circumstances.

44

the incorrect "could have" standard was harmless. Particularly given the extraordinary circumstances surrounding RJR's decision to divest the Nabisco Funds, including the timing of the decision and the requirements of the governing Plan document, we must conclude that application of the incorrect legal standard may have influenced the court's decision. Reversal is required when a district court has applied an "incorrect [legal] standard[]" that "may . . . have influenced its ultimate conclusion." See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The district court's task on remand will be to review the evidence to determine whether RJR has met its burden of proving by a preponderance of the evidence that a prudent fiduciary would have made the same decision. See Plasterers', 663 F.3d at 218.[17] In doing so, the court must consider all relevant

---

[17] In evaluating the evidence, the district court abused its discretion to the extent it refused to consider the testimony of one of Tatum's experts, Professor Lys, regarding what a prudent investor would have done under the circumstances. Even though Professor Lys lacked expertise as to the specific requirements of ERISA, his testimony was relevant as to what constituted a prudent investment decision. See Plasterers', 663 F.3d at 218; see also Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009) ("A fiduciary must behave like a prudent investor under similar circumstances . . . ."); Katsaros v. Cody, 744 F.2d 270, 279-80 (2d Cir. 1984) (noting that an investment expert's lack of experience with pension fund management did not affect his qualifications to testify as to what constituted a prudent investment decision in an ERISA case). On remand, the court should consider this with all other relevant evidence.

evidence, including the timing of the divestment, as part of a totality-of-the-circumstances inquiry. See Dudenhoeffer, No. 12-751, 573 U.S. --, at 15; DiFelice, 497 F.3d at 420. Perhaps, after weighing all of the evidence, the district court will conclude that a prudent fiduciary would have sold employees' existing investments at the time and in the manner RJR did because of the Funds' high-risk nature, recent decline in value, and RJR's interest in diversification. Or perhaps the court will instead conclude that a prudent fiduciary would not have done so, because freezing the Funds had already mitigated the risk and because divesting shares after they declined in value would amount to "selling low" despite Nabisco's strong fundamentals and positive market outlook. In either case, the district court must reach its conclusion after applying the standard this court announced in Plasterers' -- that is, whether "a hypothetical prudent fiduciary would have made the same decision anyway." 663 F.3d at 218 (quotation marks omitted) (emphasis added).

## C.

Before concluding our discussion of loss causation, we must briefly address the dissent's apparent misunderstanding of our holding, the facts found by the district court, and controlling legal principles.

46

The dissent repeatedly charges that we hold RJR "monetarily liable for objectively prudent investment decisions." It further charges that we have "confuse[d] remedies" -- claiming that fiduciaries who act with procedural imprudence should be released from their fiduciary duties but not held monetarily liable. These charges misstate our holding.

Our decision is a modest one. We affirm the district court's holdings that RJR breached its duty of procedural prudence and that a substantial loss occurred. We simply remand for the district court to determine whether, under the correct legal standard, RJR's imprudence caused that loss. If the court determines that a fiduciary who conducted a proper investigation would have reached the same decision, RJR will escape all monetary liability, notwithstanding its procedural imprudence. But if the court concludes to the contrary, then the law requires that RJR be held monetarily liable for the Plan's loss. For, as noted above, Congress has expressly provided that a fiduciary "who breaches any of the . . . duties imposed [by ERISA] shall be personally liable to make good to [the] plan any losses to the plan resulting from [the] breach." 29 U.S.C. § 1109(a) (emphasis added).

Thus, contrary to the dissent's rhetoric, nothing in our holding requires a fiduciary to "make a decision that in the light of hindsight proves best." Instead, a fiduciary need only

47

adhere to its ERISA duties to avoid liability.  So long as a fiduciary undertakes a reasoned decision-making process, it need never fear monetary liability for an investment decision it determines to be in the beneficiaries' best interest.  This is so even if that investment decision yields an outcome that in hindsight proves, in the dissent's language, less than "optimal."  Indeed, our holding, like ERISA's statutory scheme, acknowledges the uncertainty of outcomes inherent in any investment decision.  Precisely for this reason, ERISA requires fiduciaries to undertake a reasoned decision-making process prior to making such decisions.  Only because RJR failed to do so here will it be monetarily liable under § 1109(a) for any losses caused by its imprudence.

The dissent paints RJR as a faultless victim that, after following a "prudent investment strategy" has fallen prey to "opportunistic litigation."  In the dissent's view, we are "penalizing the RJR fiduciaries for doing nothing more than properly diversifying the plan."  But the district court's well-supported factual findings establish that RJR did a good deal more (or, more precisely, a good deal less).  It made a divestment decision that cost its employees millions of dollars with "virtually no discussion or analysis," without consideration of any alternative strategy or consultation with any experts, and without considering "the purpose of the Plan,

48

which was for long term retirement savings," or "the purpose of the spin-off, which was, in large part, to allow the Nabisco stock a chance to recover from the tobacco taint and hopefully rise in value." Tatum, 926 F. Supp. 2d at 678-79. RJR carried out this decision by adhering to a timeline that was "chosen arbitrarily and with no research." Id. at 679. And in doing so, RJR failed to act "solely in the interests of participants and beneficiaries" and instead "improperly considered its own potential liability." Id. at 681. Indeed, the extent of procedural imprudence shown here appears to be unprecedented in a reported ERISA case.

The dissent eschews the loss-causation standard that this court articulated in Plasterers', and would instead apply a new standard that it dubs "objective prudence simpliciter." Because this standard is not self-defining (and the dissent does not attempt to define it) it is unclear how this standard would operate in practice. At times, the dissent's analysis suggests that its "objective prudence simpliciter" test is in fact a "could have" standard. But, of course, the application of a "could have" standard contravenes our instructions in Plasterers' and elides the critical distinction between "could have" and "would have" that the Supreme Court drew in Knight. Far from "fuss[ing]" over "semantics," we are merely applying the law.

49

Moreover, the dissent fails to acknowledge the alarming consequences of its "objective prudence _simpliciter_" standard. Pursuant to this standard, ERISA's protections would be effectively unenforceable any time a fiduciary invokes the talisman of "diversification." Under the dissent's reading of the statute, any decision assertedly "made in the interest of diversifying plan assets" would be automatically deemed "objectively prudent." This approach would put numerous investment decisions beyond the reach of ERISA's fiduciary liability provision. As a result, in any case in which a fiduciary could claim that it acted in pursuit of diversification, ERISA would neither deter a fiduciary's imprudent decision-making, nor provide a make-whole remedy for injured beneficiaries. Congress certainly did not intend this result when it expressly provided that a fiduciary who breaches "any" of its ERISA duties "shall be personally liable" for "any losses to the Plan resulting from [the] breach." 29 U.S.C. § 1109(a).

The Department of Labor, the body Congress specially authorized to promulgate regulations interpreting ERISA, has expressly rejected the dissent's approach. Thus, the Department explains that "the relative riskiness of a specific investment or investment course of action does not render such investment or investment course of action either _per se_ prudent or _per se_

50

imprudent." 44 Fed. Reg. 37,221, 37,222. Rather, "the prudence of an investment decision should not be judged without regard to the role that the proposed investment or investment course of action plays within the overall plan portfolio." Id. A court cannot, as the dissent does, impose its own construction of a statute instead of that of the agency that Congress has vested with authority to interpret and administer it. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984).

By applying a new standard of its own making, by ignoring the command in § 1109(a), and by refusing to follow precedent or defer to appropriate regulations, it is the dissent who, in its words, employs "linguistic contortions" to "obfuscate rather than illuminate" the law and "overrid[e] the statute." Unlike the dissent, we refuse to make up and then apply an approach, at odds with the law, that would render ERISA a nullity in the face of any after-the-fact diversification defense.

VI.

Finally, we address the district court's orders dismissing the Benefits Committee and Investment Committee as defendants and denying Tatum leave to amend his complaint to name the individual committee members as defendants. We review the former de novo, Smith v. Sydnor, 184 F.3d 356, 360-61 (4th Cir.

51

1999), and the latter for an abuse of discretion, Galustian v. Peter, 591 F.3d 724, 729 (4th Cir. 2010).

A.

The court dismissed the Benefits Committee and Investment Committee as defendants because it concluded that "committees" are not "persons" capable of being sued under ERISA. That statute defines "person" to include "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). The district court erred in reading this list as exhaustive. That the provision does not expressly list "committees" does not mean that committees cannot be "persons who are fiduciaries" under ERISA.

We need look no further than the statute itself to conclude that a committee may be a proper defendant-fiduciary. ERISA provides that a "named fiduciary" is a "fiduciary who is named in the plan instrument." Id. § 1102(a)(2). The statute requires that a plan document "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." Id. § 1102(a)(1). This requirement ensures that "responsibility for managing and operating the [p]lan -- and liability for mismanagement -- are focused with a degree of

52

certainty." Birmingham v. SoGen-Swiss Int'l Corp. Ret. Plan, 718 F.2d 515, 522 (2d Cir. 1983)(emphasis added). Here, the Committees are the only named fiduciaries in the governing Plan document. As such, these entities are proper defendants in a suit alleging breach of fiduciary duty with respect to the Plan. Accord H.R. Rep. No. 93-1280 (1974) (Conf. Rep.), reprinted in 1974 U.S.C.C.A.N. 5038, 5075-78 (noting that a board of trustees could be a plan fiduciary even though "board" is not expressly listed as "person" under ERISA).

Furthermore, Department of Labor regulations interpreting the statute clearly state that a committee may serve as the named fiduciary in a plan document. See 29 C.F.R. § 2509.75-5, at FR-1. And this and other courts have routinely found committees to be proper defendant-fiduciaries in ERISA suits. See, e.g., Harris v. Amgen, Inc., 573 F.3d 728, 737 (9th Cir. 2009); In re Schering-Plough Corp. ERISA Litig., 420 F.3d 231, 233, 242 (3d Cir. 2005); Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1080 (4th Cir. 1989). The district court's contrary holding is at odds with the Department of Labor regulations and these cases.[18] Accordingly, we must reverse the court's dismissal of the Benefits Committee and Investment Committee.

---

[18] To the extent there is any ambiguity in the relevant provisions, we conclude that in interpreting the word "person" and its corresponding definition at 29 U.S.C. § 1002(9), we (Continued)

53

B.

After limitations had run, Tatum moved for leave to amend his first amended complaint to name the individual committee members. The court denied the motion on the ground that Tatum's claims against the individual committee members did not "relate back" to those in his first amended complaint, and thus the statute of limitations barred suit against them.

As the district court correctly recognized, an amendment to add an additional party "relates back" when (1) the claim asserted in the proposed amendment arises out of the same conduct set forth in the original pleading, and (2) the party to be added (a) received timely notice of the action such that he would not be prejudiced in maintaining a defense on the merits, and (b) knew or should have known that he would have been named as defendant "but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1). The district court concluded that the individual committee members were not on notice that they would have been named as defendants but for a mistake concerning their identity. The court did not abuse its discretion in so holding.

---

should take into account "Congress's broad remedial goals," In re Beacon Assocs. Litig., 818 F. Supp. 2d 697, 706 (S.D.N.Y. 2011), which is consistent with our holding that "committees" are proper defendant-fiduciaries in ERISA suits.

54

In both his original complaint and in his first amended complaint, Tatum named as defendants only RJR and the Committees. Tatum's decision not to include as defendants the individual committee members reflected "a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties." Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 549 (2010). This, the Supreme Court has explained, "is the antithesis of making a mistake concerning the proper party's identity." Id. Accordingly, the Court has held that Rule 15(c)'s requirements are not satisfied when, as here, "the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision." Id. at 552.

VII.

For the foregoing reasons, we affirm the district court's holding that RJR breached its duty of procedural prudence and so carries the burden of proof on causation, but vacate the judgment in favor of RJR. We reverse the order dismissing the Benefits Committee and the Investment Committee as defendants, but affirm the order denying Tatum's motion for leave to amend his complaint to add additional defendants. We remand the case for further proceedings consistent with this opinion.

55

WILKINSON, Circuit Judge, dissenting:

After a four-week bench trial, the district court found that the investment decisions of the R.J. Reynolds Tobacco Co. (RJR) fiduciaries were objectively prudent. It thus properly refused to hold the RJR fiduciaries personally liable for alleged plan losses.

Yet this court, breaking new ground, reverses the district court. With all respect for my two fine colleagues, I do not believe ERISA allows plan fiduciaries to be held monetarily liable for prudent investment decisions, and especially not for those made in the interest of diversifying plan assets. Market conditions can, of course, create fluctuations, but a prudent investment decision does not by definition cause a plan loss, the precondition under 29 U.S.C. § 1109(a) for imposing personal monetary liability upon fiduciaries.

The statutory remedy for a breach of procedural prudence that precedes a reasonable investment decision includes, explicitly, the removal of plan fiduciaries. The majority goes much further, forcing fiduciaries to face the prospect of personal monetary liability instead. This confusion of remedies is wrong three times over, and its consequences will be especially unfortunate for those who rely on ERISA plans for the prudent administration of their retirement savings. As for

57

those who might contemplate future service as plan fiduciaries, all I can say is: Good luck.

First, and yet again, under the remedial scheme laid out by ERISA, fiduciaries should not be held monetarily liable for objectively prudent investment decisions. This is true for whatever standard -- "would have," "could have," or anything else -- one adopts for loss causation. As I shall show, the majority has adopted the wrong standard, one that strays from the statutory test of objective prudence under then existing circumstances, and one that trends toward a view of prudence as the single best or most "likely" decision rather than a range of reasonable judgments in the uncertain business of investing. Despite the majority's protestations, its reversal of the district court's well-grounded finding of objective prudence and its imposition of a far more stringent test signals fiduciaries that henceforth they had better make a decision that in the light of hindsight proves the best.

Second, monetary liability is even less appropriate where, as here, the reasonable decision was taken in the interests of asset diversification. And third, on this record, the notion that the RJR fiduciaries' decision to liquidate the Nabisco stocks was anything but prudent borders on the absurd.

ERISA is, first and foremost, meant to protect plan participants from large, unexpected losses, including those that

result from holding undiversified single-stock non-employer funds. The fiduciaries knew this fact and acted upon it, only to find that prudent decisions, like good deeds, do not go unpunished when the breezes of legal caprice blow in the wrong direction.

As judges, we tend to regard the parties before us as antagonists. It is, after all, an adversary system. But, in a larger sense, the interests of plan participants and plan fiduciaries often align. It does neither any good to run up plan overhead with litigation over investment decisions taken, as this one was, to diversify plan assets and protect employees down life's road. All will be losers -- perhaps fiduciaries most immediately but plan participants, sadly, in the end.

I.

A.

It is, to repeat, doubtful that ERISA-plan fiduciaries should ever be held monetarily liable for objectively reasonable investment decisions. This follows from § 1109 of ERISA, which provides that fiduciaries that breach their duties of procedural prudence "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a) (emphasis added). In other words, monetary liability under § 1109 lies for a fiduciary's breach of the duty of procedural prudence only where a plaintiff also establishes

59

loss causation. Because investment outcomes are always uncertain, not every investment decision that leads to a diminution in plan assets counts as a loss for § 1109 purposes. Rather, loss causation only exists if the substantive decision was, all things considered, an objectively unreasonable one. If, by contrast, we might expect a hypothetical prudent investor to consider the decision prudent, the loss cannot be attributed to the actual fiduciaries.

This interpretation of § 1109's text is well established. Then-Judge Scalia's opinion in Fink v. National Savings & Trust Co., 772 F.2d 951 (D.C. Cir. 1985), is the locus classicus for the need to prove substantive imprudence prior to the imposition of personal monetary liability under § 1109. In Fink, he observed that he knew of

> no case in which a trustee who has happened -- through prayer, astrology or just blind luck -- to make (or hold) objectively prudent investments (e.g., an investment in a highly regarded "blue chip" stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand.

Id. at 962 (Scalia, J., concurring in part and dissenting in part). The majority misreads the Fink concurrence to require that a hypothetical prudent fiduciary make "the same decision." Maj. Op. at 41. In so doing, the majority imputes its own erroneous interpretation of loss causation into Justice Scalia's invocation of "objectively prudent investments." Indeed, the

60

example Justice Scalia gave -- an investment in a highly regarded blue chip stock -- demonstrates the obvious: just as there is more than one such blue chip stock, there is a reasonable range of investments that qualify as objectively prudent.

Although there is an evidentiary relationship between the breach of a fiduciary's duty of procedural prudence and loss causation, these two elements of fiduciary liability under ERISA are distinct: "It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee should have known more than he knew." Fink, 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part).

The question posed by this case has in fact already been decided. This circuit has embraced Justice Scalia's approach. In Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210 (4th Cir. 2011), we considered a suit for breach of fiduciary duty under ERISA against former plan fiduciaries. We noted that "simply finding a failure to investigate or diversify does not automatically equate to causation of loss and therefore liability." 663 F.3d at 217. Rather, in order to hold fiduciaries "liable for damages based on their given breach of [their] fiduciary dut[ies]" described in 29 U.S.C. § 1104, a

61

"court must first determine that the [fiduciaries'] investments were imprudent."  Id.; see also id. at 218 (quoting Justice Scalia's opinion in Fink).  The loss, in other words, must "result[] from" the breach, 29 U.S.C. § 1109(a), which it cannot if the investment itself was a prudent one.[1]

Our sister circuits have also generally adopted Justice Scalia's reasoning as to loss causation in Fink.  See, e.g., Renfro v. Unisys Corp., 671 F.3d 314, 322 (3d Cir. 2011) (approving of the objective-prudence test for fiduciary liability under ERISA); Kuper v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir. 1995), abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer, No. 12-751, 573 U.S. __, slip op. at 8 (June 25, 2014); Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994) ("Even if a trustee failed to conduct an

---

[1] The majority claims that "in Plasterers', we turned to the standard set forth by our sister circuits.  Thus, we explained that a decision is 'objectively prudent' if 'a hypothetical prudent fiduciary would have made the same decision anyway.'" Maj. Op. at 35 (quoting Plasterers', 663 F.3d at 218).  Nothing could be more in error.  Nothing -- no combination of phrases, words, or syllables -- in Plasterers' amounts to an adoption of a "would have" standard.  The quotation the majority treats as a holding was used merely to demonstrate that "causation of loss is not an axiomatic conclusion that flows from a breach" of a procedural duty.  663 F.3d at 218.  In actuality, the holding of the court was that fiduciaries "can only be held liable for losses to the Plan actually resulting from their failure to investigate."  Id.  The brief snippet the majority quotes from appellants' brief in Plasterers', Maj. Op. at 36 n.12, only fortifies the central point: "Would have" versus "could have" was not discussed, was not briefed, and was not before the court.

62

investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway."). To be sure, the insufficiently studious fiduciary may be (and quite possibly should be) relieved of his responsibilities. But for monetary liability to attach, it matters not whether the fiduciary spent a relatively longer or shorter time on a decision, so long as that investment decision was prudent in the end.

B.

The requirement of loss causation has three important corollaries. First, loss causation remains part of the plaintiff's burden in establishing monetary liability under ERISA. This is because, as I have noted above, loss causation is an element of a claim under § 1109, which requires that the losses "result[] from" the breach of fiduciary duty. 29 U.S.C § 1109(a); see also Plasterers', 663 F.3d at 217 ("[W]hile certain conduct may be a breach of an ERISA fiduciary's duties under [29 U.S.C.] § 1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan.").

Even if, as the district court found, the burden of production shifts to the defendant once the plaintiff makes a prima facie case for breach and loss, see Tatum v. R.J. Reynolds Tobacco Co., 926 F. Supp. 2d 648, 683 (M.D.N.C. 2013), the

63

burden of proof (persuasion) must lie with the plaintiff, where, as here, Congress has not provided for burden shifting to the defendant. Leaving the burden of proof with the plaintiff is consistent with the Supreme Court's recognition of the "ordinary default rule that plaintiffs bear the risk of failing to prove their claims," including each required element. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56 (2005). It also accords with this court's observation that, "[w]hen a statute is silent, the burden of proof is normally allocated to the party initiating the proceeding and seeking relief." Weast v. Schaffer ex rel. Schaffer, 377 F.3d 449, 452 (4th Cir. 2004), aff'd, 546 U.S. 49.

The weight of circuit precedent supports keeping the burden of proof on the party bringing suit. See, e.g., Silverman v. Mut. Ben. Life Ins. Co., 138 F.3d 98, 105 (2d Cir. 1998) (Jacobs, J., with Meskill, J., concurring) ("Causation of damages is . . . an element of the [ERISA] claim, and the plaintiff bears the burden of proving it."); Kuper, 66 F.3d at 1459 ("[A] plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan."); Willett v. Blue Cross & Blue Shield of Ala., 953 F.2d 1335, 1343 (11th Cir. 1992) (noting that "the burden of proof on the issue of causation will rest on the beneficiaries" who must "establish

that their claimed losses were proximately caused" by the fiduciary breach).

The cases cited by Tatum and the majority to justify shifting the burden of proof to RJR on loss causation are distinguishable.[2]  Several deal with self-dealing, a far more serious breach of fiduciary duty than simple lack of prudence. See, e.g., McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995); N.Y. State Teamsters Council v. Estate of DePerno, 18 F.3d 179, 182 (2d Cir. 1994); Martin v. Feilen, 965 F.2d 660, 671-72 (8th Cir. 1992).  The majority's reliance on our opinion in Brink v. DaLesio, 667 F.2d 420 (4th Cir. 1982), is also unavailing, since that case not only dealt with self-dealing, but also concerned the burden of proof regarding the extent of liability, not the existence of loss causation. See 667 F.2d at 425-26.  More relevant to this case is United States Life Insurance Co. v. Mechanics & Farmers Bank, 685 F.2d 887 (4th Cir. 1982), in which we rejected

> the novel proposition that, whenever a breach of the obligation by a trustee has been proved, the burden shifts to the trustee to establish that any loss suffered by the beneficiaries of the trust was not proximately due to the default of the trustee, and that, unless the trustee meets this burden, recovery

---

[2] For clarity, this opinion also refers to the various other RJR-related entities, such as R.J. Reynolds Tobacco Holdings, Inc., and the RJR Pension Investment and Employee Benefits Committees, simply as RJR.

against the trustee for the full loss follows in course.

685 F.2d at 896. Our precedent and the first principles of civil liability indicate that, while the burden of production may shift as a case progresses, the burden of persuasion should remain with the plaintiff in a § 1109 action.

The second notable consequence of § 1109's requirement of loss causation is a practical one: it is generally difficult to establish loss causation when a fiduciary's substantive decision is objectively prudent. This is because objectively prudent decisions tend not to lead to losses to the plan. But even where they do, they are not the sort of losses contemplated by the § 1109 remedial scheme, since it is unreasonable to fault a prudent investment strategy for the statistical reality that even the best-laid investment plans often go awry. Because "[t]he entire statutory scheme of ERISA demonstrates that Congress'[s] overriding concern in enacting the law was to insure that the assets of benefit funds were protected for plan beneficiaries," it follows that fiduciaries who "act imprudently, but not dishonestly, . . . should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the [f]und." Plasterers', 663 F.3d at 217 (internal quotation marks omitted) (quoting Brock v. Robbins, 830 F.2d 640, 647 (7th Cir. 1987)).

Thirdly, the loss-causation requirement shows how the majority has misconceived ERISA's remedial scheme. Section 1109 sets out the appropriate remedies in those situations where a fiduciary's breach of procedural prudence does not result in losses: "other equitable or remedial relief . . . , including removal of such fiduciary." 29 U.S.C. § 1109(a); see also Brock, 830 F.2d at 647 ("If [a plaintiff] can prove to a court that certain trustees have acted imprudently, even if there is no monetary loss as a result of the imprudence, then the interests of ERISA are furthered by entering appropriate injunctive relief such as removing the offending trustees from their positions."); Fink, 772 F.2d at 962 ("Breach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee . . . . But it does not sustain an action for the damages arising from losing investments.") (citation omitted). This provision for such relief as removal is in direct contrast to the monetary liability that ERISA imposes only upon a finding of loss causation. ERISA is a "comprehensive and reticulated statute," Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993) (internal quotation marks omitted), and Congress crafted its provisions with care. Removing a fiduciary is one thing; holding that same fiduciary personally liable for a prudent investment decision is something else altogether. Where, as here, the statutory text

67

speaks clearly to the proper use of monetary versus other, more traditionally equitable remedies, it should be followed, not flouted.

The majority gets this all wrong. It states that § 1109(a) "provides for both monetary and equitable relief, and does <u>not</u> (as the dissent claims) limit a fiduciary's liability for breach of the duty of prudence to equitable relief." <u>Maj.</u> <u>Op.</u> at 17 (emphasis in original). Of course it provides for both, but it provides for monetary liability only to make good losses to the plan <u>resulting from</u> the breach. And here the court found after a month-long trial that such losses did not result, because the investment decision was itself objectively prudent. It is astounding that ERISA fiduciaries are henceforth going to be held personally liable when losses did not "result from" any breach on their part. The majority decision quite simply reads the words "resulting from" right out of the statute.

## C.

The majority, Tatum, and Tatum's amici focus on supposed distinctions between whether a hypothetical prudent fiduciary "would have" or merely "could have" made the same decision that the RJR fiduciaries did. They then fault the district court for using the latter standard. Tatum argues that the "could have" standard used by the district court will turn ERISA's demanding fiduciary obligations into a "corporate business judgment rule,"

68

since it "renders irrelevant the prudence or non-prudence of the fiduciaries' actions in making those decisions." Br. of Appellant at 36, 37. The Acting Secretary of Labor argues that a "could have" standard "creates too low a bar, allowing breaching fiduciaries to avoid financial liability based even on remote possibilities." Br. of Acting Sec'y of Labor at 23.

The majority's claim that the district court's approach "encompass[es] even the most remote of possibilities," Maj. Op. at 39, is a serious mischaracterization. As the district court observed, this is a "strained reading" of its view, which was simply that objective prudence does not dictate one and only one investment decision. Tatum, 926 F. Supp. 2d at 683. ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); see also 29 C.F.R. § 2550.404a-1(a). As a result, the district court's standard would not be satisfied merely by imagining any single hypothetical fiduciary that might have come to the same decision. Rather, it asks whether hypothetical prudent fiduciaries consider the path chosen to have been a reasonable one. The Supreme Court recently came to a similar conclusion. The Court suggested that where a plaintiff alleges that ERISA

69

plan fiduciaries should have utilized inside information in administering single-stock funds, courts "should also consider whether the complaint has plausibly alleged that a <u>prudent fiduciary</u> in the defendant's position <u>could not have concluded</u> that" acting on the inside knowledge "would do more harm than good." <u>Fifth Third</u>, slip op. at 20 (emphasis added).

That ERISA's duty of prudence allows for the possibility that there may be several prudent investment decisions for any given scenario should not be a surprise. Investing is as much art as science, in which there are many options with uncertain outcomes, any number of which may be prudent. Tatum's own experts conceded at trial that prudent minds may disagree, indeed diametrically, over the preferable course of action in a particular situation. <u>Tatum</u>, 926 F. Supp. 2d at 683 n.27, 690. Thus, a decision may be objectively prudent even if it is not the one that plaintiff, armed with all the advantages of hindsight, now thinks is optimal. Optimality is an impossible standard. No investor invariably makes the optimal decision, assuming we know what that decision even is.

Ultimately, the majority's and Tatum's minute parsings of the differences between "would have" and "could have" obfuscate rather than illuminate. It is semantics at its worst. The same is true of their definition of a reasonable investment decision as the one that hypothetical prudent fiduciaries would "more

70

likely than not" have come to.  This provides no legal basis on which to reverse the district court's simple finding, after a month-long bench trial, that defendants made an objectively prudent investment decision here.

What might plaintiffs' new semantics mean?  Reading the plaintiffs' "would have" standard to permit fiduciaries to escape monetary liability only if they make the decision that the majority of hypothetical prudent fiduciaries would "more likely than not" have made is all too treacherous.  Not only does the "more likely than not" language insistently urged by the majority, plaintiff, and his various amici find no support in statute or regulation.  Not only is it a transparent gloss upon the Act.  It seeks to shift the standard of objective prudence to one of relative prudence: whether prudent fiduciaries would "more likely than not" have come to "the same [investment] decision" that defendants did.  Maj. Op. at 37; Br. of Appellant at 7; see also Br. of Acting Sec'y of Labor at 23; Br. of AARP & Nat'l Emp't Lawyers Ass'n at 14.  The majority orders the district court on remand to divine whether "a fiduciary who conducted a proper investigation would have reached the same decision."  Maj. Op. at 47 (emphasis added). The only possible effect of such language is to squeeze and constrict and, once again, to ignore the fact that there is not

71

one and only one "same decision" that qualifies as objectively prudent.

Thus plaintiff would substitute for the fiduciary's duty to make a prudent decision a duty to make the best possible decision, something ERISA has never required.  Take a scenario in which 51% of hypothetical prudent fiduciaries would act one way and 49% would act the other way.  What sense, let alone justice, is there in penalizing a fiduciary merely for acting in accordance with a view that happens to be held by a bare minority?  And how, absent an unhealthy dose of hindsight, could we ever know the precise breakdown of hypothetical fiduciaries with regard to a particular investment decision?  See Br. of Chamber of Commerce of U.S. of Am. & Am. Benefits Council at 15-16.

While the majority protests it has not adopted the most prudent standard, its actions speak louder than words.  It has reversed a "merely" prudent, eminently sensible decision, and demanded much more.  Moreover, all its fuss over "would have/could have" carries us far from the general standard of objective prudence embodied in § 1104(a)(1)(B).  That is, of course, the straightforward test that Plasterers' articulated when it remanded back to the district court to "determine the prudence of the [fiduciaries'] actual investments."  663 F.3d at 219.  The majority complains that the dissent fails "to define"

72

the objective prudence standard or to say precisely "how this standard would operate in practice." Maj. Op. at 49. But the trial here showed exactly how that standard operates in practice. Prudence depends inescapably upon the particular circumstances confronting fiduciaries; it is a fool's errand to attempt to sketch every situation that might arise. Even without the majority's linguistic contortions, the law of fiduciary obligations under ERISA is complex enough. The layer of scholasticism the majority adds to what should be a straightforward factual inquiry into objective prudence helps no one. One can, of course, play the endless permutations of the "would have"/"could have" game. But the test is one of objective prudence simpliciter, taking the circumstances as they existed at the time.

To make matters worse, the majority all but directs a finding of personal liability on remand. In affirming the district court's finding that RJR was procedurally imprudent, the majority falls over itself in its rush to defer to the district court's "extensive factual findings." Id. at 22. Fair enough: I have no quarrel with the trial court's "extensive factual findings" that the RJR fiduciaries acted in a procedurally imprudent fashion. Yet when it comes to substantive prudence, the majority slams the door on the district court's "extensive factual findings" when the majority

73

even so much as deigns to discuss them. Moreover, the majority minimizes risk as a factor, stressing instead "the timing of the decision and the requirements of the governing Plan document," id. at 45, despite ERISA's express command that fiduciaries "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C) (emphasis added). Further, the majority ignores the Supreme Court's statement that § 1104 "makes clear that the duty of prudence trumps the instructions of a plan document." Fifth Third, slip op. at 11. According to the majority, "plan documents [are] highly relevant" to the objective prudence inquiry, Maj. Op. at 44, but risk is merely "relevant," id. at 43. It is difficult to see how fiduciaries can survive this loaded calculus, one in which procedural imprudence all but ensures the obliteration of the loss causation requirement.[3]

---

[3] The majority contends that "[u]nder the dissent's reading of the statute, any decision assertedly 'made in the interest of diversifying plan assets' would be automatically deemed 'objectively prudent.'" Maj. Op. at 50. That statement is patently incorrect, for if there were any *per se* rule of the sort that the majority suggests, there would have been no need for the district court to conduct an extended trial considering all the circumstances, including the timing of the decision and the governing plan document, that bore on the investment judgment. In point of fact, it is the majority that minimizes the importance of asset diversification as one of the factors bearing upon the objective prudence inquiry despite ERISA's clear instruction to the contrary.

74

D.

There is one final point.  The majority tries to justify what it is doing with the thought that its approach is necessary to deter fiduciaries from imprudent behavior.  But that in no way justifies overriding the statute -- in particular § 1109, which establishes a requirement of loss causation, and § 1104, which establishes a standard of prudence under all the circumstances.  This is a rewriting of the statute, and, frankly, Congress's wisdom is a lot more persuasive than the majority's.

Under the statute as written, the standard used by the district court deters fiduciaries from procedural imprudence by the threat of removal and from substantive imprudence by the knowledge that resulting losses to the fund will in fact lead to liability.  As we said in Plasterers', quoting the Seventh Circuit:

> The only possible statutory purpose for imposing a monetary penalty for imprudent but harmless conduct would be to deter other similar imprudent conduct. However, honest but potentially imprudent trustees are adequately deterred from engaging in imprudent conduct by the knowledge that imprudent conduct will usually result in a loss to the fund, a loss for which they will be monetarily penalized.  This monetary sanction adequately deters honest but potentially imprudent trustees.  Any additional deterrent value created by the imposition of a monetary penalty is marginal at best.  No ERISA provision justifies the imposition of such a penalty.

75

663 F.3d at 217-18 (internal quotation marks omitted) (quoting Brock, 830 F.2d at 640).

II.

Even if one thinks that monetary liability should somehow attach to prudent investment decisions, it should almost never lie where the decision was made, as this one was, in the interest of diversifying plan assets. The importance of diversification in retirement plans is reflected in ERISA's text, which explicitly requires plan fiduciaries to "diversify[] the investment of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C) (emphasis added).

"Diversification is fundamental to the management of risk and is therefore a pervasive consideration in prudent investment management." Restatement (Third) of Trusts § 227 cmt. f (1992). Diversification's ability to reduce risk while preserving returns is a major focus of modern portfolio theory, which has been adopted both by the investment community and by the Department of Labor in its implementing regulations for ERISA. See DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir. 2007) (citing 29 C.F.R. § 2550-404a-1). Diversification is even more important in the context of retirement savings, where the avoidance of downside risk is of paramount concern. "A trustee is not an entrepreneur. . . . He is supposed to be careful

76

rather than bold." Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 733 (7th Cir. 2006).

Although ERISA does not in so many words require every fund in an investment plan to be fully diversified, each fund, when considered individually, must be prudent. See DiFelice, 497 F.3d at 423. This is because 401(k) participants could easily view the inclusion of a fund as an endorsement of it by the plan fiduciaries and invest a sizeable portion or even the entirety of their assets in a high-risk fund. The RJR fiduciaries were concerned about this very possibility when they decided to maintain a prohibition on making new investments into the Nabisco funds. See Tatum v. R.J. Reynolds Tobacco Co., 926 F. Supp. 2d 648, 661-62 (M.D.N.C. 2013).

In addition, once plan participants allocate their assets among various funds, there is a substantial risk that inertia will keep them from carefully monitoring and reallocating their retirement savings to take into account changing risks. Indeed, a witness for RJR testified at trial that over 40% of plan participants who had invested in the Nabisco funds did not make a single voluntary plan transfer over a five-and-a-half-year period from 1997 to 2002. See J.A. 846-48. Because the RJR plan already contained an employer-only single-stock fund, maintaining the Nabisco funds would multiply the number of

77

risky, single-stock funds in which RJR plan participants could invest. See Tatum, 926 F. Supp. 2d at 685.

The requirement that management of retirement plans be prudent rather than aggressive strongly supports diversifying each fund. As the district court recognized, a "single stock fund carries significantly more risk than a diversified fund." Id. at 684; see also Summers v. State St. Bank & Trust Co., 453 F.3d 404, 409 (7th Cir. 2006). For this reason, single-stock funds are generally disfavored as ERISA investment vehicles. See, e.g., DiFelice, 497 F.3d at 424 (noting that "placing retirement funds in any single-stock fund carries significant risk, and so would seem generally imprudent for ERISA purposes"). To be sure, Congress has provided a limited exception from ERISA's general diversification requirements for certain types of employer-only single-stock funds. See 29 U.S.C. §§ 1104(a)(2), 1107(d)(3). Still, single-stock funds inherently "are not prudently diversified." Fifth Third Bancorp v. Dudenhoeffer, No. 12-751, 573 U.S. __, slip op. at 5 (June 25, 2014) (emphasis in original). And absent this narrow congressional carve-out for employer-only single-stock funds, "[t]here is a sense in which, because of risk aversion, [a single-stock fund] is imprudent per se." Armstrong, 446 F.3d at 732.

In this case, the Nabisco funds were even more dangerous than an ordinary single-stock fund. Because of the "tobacco taint" and the risk that a massive tobacco-litigation judgment against RJR could also harm Nabisco, the performance of the Nabisco funds was potentially correlated with that of RJR itself. Thus, retirement plans containing the Nabisco funds were doubly undiversified. First, they included the stocks of a single company rather than a range of companies. Second, the same external forces that could harm RJR -- and thus imperil the employment of plan participants -- could simultaneously tank the value of the Nabisco funds. See Tatum, 926 F. Supp. 2d at 685. In other words, keeping the Nabisco funds in the RJR plan would create the risks of an Enron-like situation, in which the health of an employer and the retirement savings of its employees could be adversely affected simultaneously. See Richard A. Oppel Jr., Employees' Retirement Plan Is a Victim as Enron Tumbles, N.Y. Times, Nov. 22, 2001, at A1. But unlike the employer single-stock funds that might have legislative sanction, no such congressional approval existed for the Nabisco funds.

By penalizing the RJR fiduciaries for doing nothing more than properly diversifying the plan, the majority and Tatum threaten to whipsaw investment managers of pension and retirement funds. The majority's approach falls into the trap of seeing plan fiduciaries and participants as inveterate

79

adversaries. In fact, nothing could be further from the truth. Fiduciaries often act to the inestimable benefit of plan participants, and they do so most clearly when they follow ERISA's mandate to diversify plan holdings. But the majority's approach will wreak havoc upon this harmony, encouraging opportunistic litigation to challenge even the most sensible financial decisions. Here, the RJR fiduciaries knew they had a ticking time bomb on their hands. Had the plan fiduciaries failed to diversify and the Nabisco stocks had continued to decline, the fiduciaries would have been sued for <u>keeping</u> the stocks. As the Supreme Court noted:

> [I]n many cases an ESOP fiduciary who fears that continuing to invest in company stock may be imprudent finds himself between a rock and a hard place: If he keeps investing and the stock goes down he may be sued for acting imprudently in violation of § 1104(a)(1)(B), but if he stops investing and the stock goes up he may be sued for disobeying the plan documents in violation of § 1104(a)(1)(D).

<u>Fifth Third</u>, slip op. at 14. Putting plan managers in a cursed-if-you-do, cursed-if-you-don't situation is unfair to them and damaging to ERISA-plan administration generally.

### III.

Even if prudent decisions made in the interest of asset diversification could ever lead to monetary liability, it is inconceivable that they could do so on these facts. As the

80

district court well understood, if monetary liability lies here, then it will lie for a great many other prudent choices as well.

"[W]hether a fiduciary's actions are prudent cannot be measured in hindsight . . . ." DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 424 (4th Cir. 2007). This is because "the prudent person standard is not concerned with results; rather it is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994) (alteration and internal quotation marks omitted). "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." Fifth Third Bancorp v. Dudenhoeffer, No. 12-751, 573 U.S. __, slip op. at 15 (June 25, 2014) (alteration in original).

In addition to the diversification imperatives described above, there were at least three reasons for the RJR fiduciaries to eliminate, at the time they had to make the decision, the Nabisco stocks from the RJR 401(k) plan. First, as found by the district court, there was a substantial threat to the Nabisco stocks' share prices from the "tobacco taint." Tatum v. R.J. Reynolds Tobacco Co., 926 F. Supp. 2d 648, 659-60 (M.D.N.C. 2013). Although Nabisco had theoretically insulated itself from

81

liability for RJR's tobacco-related litigation by entering into indemnification agreements with RJR, there was always a danger that holders of judgments against RJR might sue Nabisco for any amount that RJR could not pay. This danger became especially acute after a Florida jury ruled in July 1999 against RJR in a class-action lawsuit. Id. at 659. As the damages portion of the trial began in the fall of 1999, RJR began to worry that it would not be able to fully pay a multibillion dollar award and that members of the class would sue Nabisco for the unpaid remainder. Id. at 660. In a June 1999 report to the SEC, Nabisco acknowledged these very risks. Id. at 659. And when RJR lost an important punitive-damages ruling in the Florida suit, the stock prices of RJR and Nabisco both dropped sharply. Id. at 660. Indeed, the Florida jury ultimately awarded the class over $140 billion in punitive damages. Id. at 660 n.9. (Related litigation is ongoing. On July 18, 2014, a Florida jury awarded $23.6 billion in punitive damages against RJR in an individual case stemming from that class action.)

Second, Nabisco's stock prices had been steadily falling since the two companies split. Between June 15, 1999, when the split was finalized, and January 31, 2000, when RJR sold the two Nabisco stocks in its 401(k) plan, their prices had fallen substantially in value, one by 60% and the other by 28%. Id. at 666. Cautious fiduciaries would naturally view optimistic

82

glosses on Nabisco's continuing stock decline with skepticism. Not only were analyst reports during the dot-com bubble colored by "optimism bias," but even the neutral and positive reports noted the effect of the tobacco taint and that the current share price might well be accurate. Id. at 662-63. And even had RJR chosen to keep the Nabisco stocks, there was, as the district court noted, no reason to think that the stocks would have provided above-market returns, given the public nature of the relevant financial information and the general efficiency of the stock market. Id. at 686-88. As the Supreme Court has recognized, "a fiduciary usually 'is not imprudent to assume that a major stock market . . . provides the best estimate of the value of the stocks traded on it that is available to him.'" Fifth Third, slip op. at 17 (quoting Summers v. State Street Bank & Trust Co., 453 F.3d 404, 408 (7th Cir. 2006)) (alteration in original).

Third, the ultimate cause of the dramatic appreciation in Nabisco stock prices in 2000 -- the bidding war sparked by investor Carl Icahn's takeover bid -- was totally unexpected by RJR, analysts, and the broader market. Notably, when Icahn acquired a large block of Nabisco shares in November 1999, Nabisco's stock prices did not react and analyst reports did not mention a possible takeover bid. Tatum, 926 F. Supp. 2d at 688. In addition, the RJR-Nabisco split was structured such that the

83

spinoff would be tax-free as long as, broadly speaking, Nabisco did not initiate a corporate restructuring within two years. Id. at 653. Thus, a takeover by Icahn was only feasible if he initiated it. This limitation made an Icahn offer, and the consequent bidding war, even less likely. Id. at 688-89.

Ultimately, the RJR fiduciaries had little reason to think that the Nabisco stocks in the 401(k) plan would appreciate in value, and every reason to worry that they would continue to decline. The fiduciaries' decision to liquidate the Nabisco funds was prudent, and certainly not "clearly imprudent." Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 219 (4th Cir. 2011). Arguably, it was the most prudent of the options available, for it protected plan participants from the dangers of risky shares held in undiversified plan funds. To hold otherwise requires viewing the RJR fiduciaries' actions through the lens of hindsight, a grossly unfair practice that our precedent categorically forbids.

IV.

The majority has reversed the most substantiated of district court findings under the most stringent of hindsight tests. To impose personal monetary liability upon fiduciaries for prudent investment decisions made in the interest of asset diversification makes no sense. What this decision will lead to, despite all the words from the majority and Tatum, is

84

litigation at every stage behind reasonable investment decisions by ERISA-plan fiduciaries. Who would want to serve as a fiduciary given this kind of sniping?

ERISA was "intended to 'promote the interests of employees and their beneficiaries in employee benefit plans.'" DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 417 (4th Cir. 2007) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983)). Yet far from safeguarding the assets of ERISA-plan participants, the litigation spawned by the majority will simply drive up plan-administration and insurance costs. It will discourage plan fiduciaries from fully diversifying plan assets. It will contribute to a climate of second-guessing prudent decisions at the point of market shift. It will disserve those whom ERISA was intended to serve when fiduciaries are hauled into court for seeking, sensibly, to safeguard retirement savings.

I had always entertained the quaint thought that law penalized people for doing the wrong thing. Now the majority proposes to penalize those whom the district court found after a month-long trial did indisputably the right thing -- in professional parlance, the objectively prudent thing.

I would affirm.